IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Criminal Action |
| ) | No. 04-05017-01-CR-SW-DW |
| PHYLLIS C. HOOD, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Defendant has filed a Motion to Suppress Evidence, in which she alleges that evidence obtained as a result of a search should be suppressed because of an unlawful search and seizure. Defendant also filed a Motion to Suppress Statements, which she subsequently withdrew.

The matter was set for an evidentiary hearing, which was held before the undersigned on March 2, 2005. The defendant was present with counsel, Stacy Bilyeu, and the United States was represented by Kimberly Weber Dean, Special Assistant United States Attorney.

It is defendant's contention that any evidence obtained as a result of a package search in Rialto, California on January 23, 2003, should be suppressed. The government asserts that defendant lacks standing to challenge the search, and further, that there was reasonable suspicion to conduct the search.

The first witness for the government was Richard Swigart, a former San Bernardino County Sheriff's Deputy. On January 21, 2003, when working for that department as a detective, he was working on a parcel team. This involved picking out suspicious packages, based on a "package

1

profile," and performing package seizures through a verbal agreement with private companies like UPS and FedEx. He used a canine unit, Taz, whom he had had since June of 1999. Taz was a trained drug detection dog.

Officer Swigart testified that some aspects of package profiling where packages would be found suspicious could include packages with false information on the return label, payment in cash, and overnight shipment. On the 21st of January, while working at FedEx, he noticed a FedEx envelope with a square object inside, with a handwritten mailing label. The package was on the outbound belt, which was stopped at the time. This was of concern to him because anything can be written on the shipping label, and the company does not check to verify the information. The overnight priority shipping caused him concern, because most people will pay for that kind of shipment on an account. Further, if people do pay cash, they are usually concerned about the package arriving on time, so they will provide a telephone number for the sender and/or the recipient. In this case, the send had paid almost $30.00 in cash, and had started to write out a telephone number, but scratched it out and put "N/A" in the sender's box on the label. "N/A" was also written in the box for the recipient's telephone number. Based on his training and experience, spending this amount of cash caused him concern, since a package could be sent through the postal service for about $5.00. He also determined that the address for the sender was wrong, because the sender listed an address of "Citrus Avenue," in Bloomington, CA, and he knew that there was no such address in that town. It was his belief that this package therefore fit the profile for a shipment of a controlled substance. The officer took the package off the outbound belt and placed it with some other packages. He then got Taz, pointed him in the direction of the packages, and he alerted to this package. Officer Swigart testified that it took him about one minute to make this initial

observation regarding the suspicious nature of the package, and took about five minutes for Taz to make a positive alert. He concluded that the dog had positively alerted to the presence of narcotics in the package. With this information, he took the parcel, filled out an order for FedEx, and got a search warrant the next morning. He secured a search warrant for the parcel by going to the San Bernadino County Courthouse with an affidavit he prepared. He then executed the search warrant on the package, opened an outer envelope, opened a tissue-paper covered box, and then opened the wooden box inside. When he took the top off the wooden box, he saw a sealed package inside, which tested positive for methamphetamine. He stated that he had no reason to believe the package was designated for Phyllis Hood.

     Officer Swigart then called DEA in Springfield, Missouri, to see if that office wanted to do a controlled delivery. Based on his training and experience, he knew California was a major source area for shipping narcotics and for the production of methamphetamine. Regarding the destination of Joplin, Missouri, he had sent other parcels with controlled substances to Joplin and other places in the area. After the package was sent to DEA in Springfield, that was the end of his investigation of this parcel.

     On cross examination, the witness testified that this agreement with FedEx is just a verbal agreement, and there is no benefit to either party. No money exchanges hands. When questioned more about package profiling, Officer Swigart testified that the majority of labels on FedEx packages that he sees are preprinted, and he believes that when the label is handwritten, it is suspicious. He acknowledged that he had no statistics and knew of no studies that backed up the conclusions regarding package profiling that he had described. He acknowledged that the square object in the envelope was not suspicious, and neither were the handwritten label, nor the cash

3

payment of $30.00. It was his testimony, however, that under the totality of the circumstances, these factors added up to reasonable suspicion. He admitted that he only assumed that the sender had scratched out the telephone number. Based on his experience, it is not normal for a FedEx employee to fill out the label. He also admitted that it was possible that the sender, or someone else, made a mistake about Citrus Avenue being in Bloomington, rather than Fontana, as the cities are right next to each other. He acknowledged that a lot of people may want items shipped priority overnight. Officer Swigart testified that sometimes the address on the label is a made-up name, and sometimes the actual recipient's name is on the label. It wouldn't surprise him that the addressee on a package with drugs is a fictional person. Regarding the delivery of this package, it was delayed one day.

Regarding how the package got to the location where the dog sniffed it, he removed the package from the outbound belt, put it with some other packages, and went for his dog. He put his dog about twenty feet away from the packages and pointed him in their direction.

On redirect examination, Officer Swigart testified that the outbound belt was stationary when he took the package off. All the factors involved in the shipping label were suspicious to him in their totality, based on his participation in package seizures for about six years.

On recross examination, the officer testified that these factors would not be suspicious to a lay person, but they are to a trained officer. He admitted that in his affidavit in support of the search warrant, he did not explain why these things were suspicious.

The second witness for the government was Sergeant James Musche of the Missouri State Highway Patrol, who is currently assigned to COMET. Previously, he was a task force officer with DEA. On the date in question, he became aware of the package in this case. He received the package, which contained methamphetamine, on January 23, 2003. He has had experience with such

4

packages. Usually, the officers open the package, confirm the package for delivery, and place a representative sample of the contents in the package. The package was addressed to Andrew Williamson in Joplin. He had no information that the intended recipient was defendant, Phyllis Hood. They reassembled the package and called officers in Joplin. They secured a search warrant for the delivery. They drove the package to Joplin and a Missouri State Highway Patrol Officer, Corporal Renken, posed as a FedEx delivery person, and delivered the package. Corporal Renken went back a few minutes later and served the search warrant. There were four people there, but defendant was not among them. Based on his investigation, Andrew Williamson does not exist, and defendant does not use this name. The man who took the package was Gaylon Ward, who said he was taking the package for an older white female named "Phyllis." He was suppose to call her and let her know the package had arrived. Mr. Ward agreed to record the telephone call to defendant. Officers Musche and Hood hid in the bedroom, while the call was made. Defendant arrived about 18 minutes later, and left the residence a few minutes after that. As soon as they heard the door close, they contacted Gaylon Ward, who said defendant had put the package in a Wal-mart bag and left. They let the officers outside know this.

On cross examination, Sergeant Musche testified that the officers take out most of the drugs when they reassemble the packages. He thought there was about 1 ½ ounces in the package, and they left less than a gram in the package. The package, as far as he knew, was addressed to a false person, and this is very common. Typically, the package is mailed to a fictitious person. Initially, they had no idea that this package was going to defendant. After speaking with Mr. Ward, it was clear that the package was to go to defendant. Mr. Ward stated that he had received packages for defendant before. At the point defendant was arrested, he had never heard her indicate that she knew

5

what was in the package. He had intelligence on a prior package that California had intercepted, which was going to defendant. He did not know Mr. Ward and did not know what his reliability was like. He knew that Detective Larry Stout directed the Joplin Police to arrest her because she had the drugs. The officer was present when she was arrested, and she made incriminating statements.

On redirect examination, Officer Musche said that he had seven years of experience and training. Based on his review of the telephone conversation tape, he concluded that defendant was worried about the package being late because it contained contraband.

On recross examination, he stated that, based on the nature of the conversation, defendant indicated she had to call someone else before she came over, and expressed concern that the package was late. There were no specific terms used in the conversation that would reflect the contents of the package.

The third witness for the government was Larry Stout, who is a detective with the Joplin Police Department, working in the narcotics unit. On January 23, 2003, he participated in the search warrant at 1502 Michigan, in Joplin. He became aware that defendant was the intended recipient of the package after it was delivered. He had prior experience with defendant, and he knew that a package that had been addressed to her in the past was found to contain a pound of methamphetamine. Corporal Stout saw defendant arrive at 1502 Michigan, and observed her walking towards the front door of the apartment complex. He later saw her in the truck again. He received information from officers inside the apartment that she had the package. Corporal Stout directed Joplin Police Officer Jeff Barsness to stop defendant's vehicle because of the belief that she had a package containing controlled substances.

On cross examination, the officer testified that regarding their information on the other

package, he believed that it was intended for defendant, whether or not it was addressed to her. He did not know who this package was going to until after it had been delivered, and then he found out that defendant was coming to get it. He concluded that she was the intended recipient. He based his conclusion on what the officers inside told him, which was that defendant was coming to take the package. He had no information whether she was aware of the contents of the package. Corporal Stout did not remember whether the package had been opened when he went to the arrest site. He stated that defendant was stopped and arrested, the vehicle was searched, contraband was found, she was taken to the police station, and she made incriminating statements.

In this case, the government asserts that at the time of the search and seizure of the package, defendant was neither the sender nor the addressee. Therefore, it is contended that she had no privacy interest in the package, and that her motion to suppress should be denied because she has failed to meet her burden of establishing standing.

Defendant argues that she does have standing because she was the intended recipient of the methamphetamine concealed in the package. She asserts that there are no cases that hold that where a package is addressed to a fictitious name, the actual recipient lacks standing. It is her position that the government's cases do not relate to situations involving packages being sent through the mail. She asserts an ownership interest in the package, claiming that she had a reasonable expectation of privacy in it. Defendant relies on the fact that Mr. Ward did not open the package, to bolster her standing claim.

As highlighted by defendant, there is no authority directly on point on this issue. Based on the general law on standing, however, the Court is willing to accept, under the facts of this case, that standing exists. The law provides that an individual challenging a search and seizure can establish

7

a sufficient interest to constitute standing "if he has an adequate possessory or proprietary interest in the place or object searched" and if this assertion of a property interest is supported by an expectation of privacy. See United States v. Kelly, 529 F.2d 1365, 1369 (8th Cir. 1976). From the facts that were adduced at the hearing in this case, the Court finds that defendant has established that, as the intended recipient of the package, she had an adequate proprietary and privacy interest that is sufficient to establish standing.

Defendant challenges the search and seizure of the package on the grounds that, at the time Deputy Swigart removed the package from the outbound belt, detained it for a canine sniff, and subjected it to the canine sniff, there was no objectively reasonable, articulable suspicion that the package contained contraband.

The law is clear that to support a seizure, "[l]aw enforcement authorities must possess a reasonable suspicion based on articulable facts that a package contains contraband before they may detain the package for investigation." United States v. Johnson, 171 F.3d 601, 603 (8th Cir.1999) (citing United States v. Van Leeuwen, 397 U.S. 249, 252-53 (1970)). "Reasonable suspicion exists when, based on the totality of the circumstances, an officer possesses a particularized and objective basis for suspecting that the package contains contraband, that is, more than an inchoate and unparticularized suspicion or hunch." Id. (internal quotations and citation omitted). Further, "[l]aw enforcement officers are permitted to draw 'inferences and deductions that might well elude an untrained person.' " Johnson, 171 F.3d at 604 (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)). The Fourth Amendment, however, requires law enforcement "to explain *why* the officer's knowledge of particular criminal practices gives special significance to the apparently innocent facts observed." Johnson, 171 F.3d at 604 (citing Cortez, 449 U.S. at 418-22) (emphasis in original).

8

Based on the full review of the record, the Court finds that Deputy Swigart articulated a sufficient basis to warrant seizing the package. Based on his training and experience, he articulated a number of reasons that this package fit the profile for a package that contained contraband. Specifically, he noted that drug traffickers typically send packages by priority overnight mail, that the mailing label was handwritten, that it bore an incorrect return address, that no telephone numbers were provided, that the shipping was paid for in cash, that the package was shipped from Los Angeles, a drug source city, and that it was shipped to Joplin, an area where he had had previous experiences with contraband packages. While each of these factors, considered alone, might be consistent with innocent mail use, when viewed in the aggregate by a trained law enforcement officer, the Court finds that these factors give rise to the objectively reasonable suspicion needed to justify the seizure of the package and the canine sniff by Taz. Deputy Swigart, relying on his experience and training, explained the relevance of the independently insignificant facts, and demonstrated the reasonable suspicion required under the Fourth Amendment. Considering the totality of the circumstances, the Court finds that Deputy Swigart had a reasonable suspicion based on articulable facts sufficient to detain the package and subject it to a dog sniff. United States v. Logan, 362 F.3d 530, 533-34 (8th Cir. 2004).

It is also contended that the detention, search and seizure, and arrest of defendant were unlawful and in violation of her Fourth Amendment rights because they were not based upon an objectively reasonable articulable suspicion of criminal activity to detain nor upon probable cause to search or arrest.

Based on the evidence before the Court, it must be concluded that the officers in this case had probable cause to stop and arrest defendant, and to conduct a search incident to that arrest. The

government correctly asserts that a finding of probable cause depends on the totality of the circumstances, and that the Court, in making this determination, may consider the collective knowledge of all officers involved. United States v. Morgan, 997 F.2d 433, 435 (8th Cir. 1993). In this case, Officer Barsness' relied upon Officer Stout's instructions to stop defendant's vehicle and to arrest her. Officer Stout clearly had sufficient knowledge to believe that defendant was engaged in criminal activity. He observed her walking towards the front door of the apartment complex. He later saw her in the truck again. He received information from officers inside the apartment that she had the package. The officers had conducted a controlled delivery of a FedEx package, which was intended for defendant. Defendant took possession of the package, which was known to contain contraband. Mr. Ward told officers inside that she was coming to pick up the package, and that he had held packages for her before. The officers corroborated the statements of Mr. Ward by taping a conversation in which defendant arranged to pick up the package, and during which she expressed concern that it had been late in arriving. They observed her picking up the package, and they reported to the officers outside when she left the residence. She was then stopped, arrested, and a search incident to that arrest was conducted. Based on the cumulative knowledge of the officers involved in this investigation, the Court finds that probable cause existed in this case. Further, based on a full review of the record, the Court finds defendant's arguments regarding an illegal stop, detention, arrest, and search to be without merit.

      Having fully reviewed the evidence in this case, the Court finds that defendant has failed to establish a Fourth Amendment violation. Accordingly, it will be recommended that the motion to suppress evidence should be denied.

      For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local

Rule 72.1 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendant's Motion to Suppress Evidence be denied.

      /s/ James C. England
JAMES C. ENGLAND
United States Magistrate Judge

Date: March 21, 2005